```
 1

 2                 IN THE UNITED STATES DISTRICT COURT

 3                    FOR THE DISTRICT OF NEVADA

 4

 5   Michael Moebius,              )   Criminal Case No.
                                   )   2:21-cv-00970-ART-VCF
 6             Plaintiff,          )
                                   )
 7   vs.                           )
                                   )
 8   Tony Carnevale, et al,        )   Thursday, December 15, 2022
                                   )
 9             Defendants.         )
     _____

10

11                  TRANSCRIPT OF MOTION HEARING
                  HONORABLE ANNE R. TRAUM PRESIDING
12                 UNITED STATES DISTRICT JUDGE

13

14                    A P P E A R A N C E S

15   For the Plaintiff:         Reginald Russell
                                Higbee & Associates
16                              3110 W. Cheyenne Avenue, Ste 200
                                North Las Vegas, NV  89032
17
     For the Defendants:        Christopher R. Miltenberger
18                              Greenberg Traurig, LLP
                                10845 Griffith Peak Drive
19                              Suite 600
                                Las Vegas, NV 89135
20
                                Jeffrey P. Dunning
21                              Greenberg Traurig, LLP
                                77 West Wacker Drive
22                              Chicago, IL  60601

23   Official Court Reporter:   Donna Prather
                                410 S. Virginia Street
24                              Reno, NV  89501

25   Proceedings taken by Certified Stenographic Reporter and
     transcribed using Computer-Assisted Translation
```

1          (Proceedings commenced at 10:09 a.m.)

2               THE CLERK:  This is the date and time set for oral

3     arguments regarding the motion for summary judgment in Case

4     No. 2:21-cv-00970-ART-VCF.  Michael Moebius v. Tony Carnevale,

5     et al.

6               Counsel, please state your appearances for the

7     record.

8               MR. RUSSELL:  Reginald Russell, Bar Number 12275,

9     for plaintiff.

10              MR. MILTENBERGER:  Good morning, Your Honor.  Chris

11    Miltenberger on behalf Caesars Entertainment.

12              MR. DUNNING:  Good morning.  Jeff Dunning, also on

13    behalf Caesars Entertainment, Greenberg Traurig.

14              THE COURT:  Good morning.  Thank you, gentlemen.

15              Okay.  So we're here on the defendants' motion for

16    summary judgment.  Would you like to go first and I'll let you

17    argue for a few minutes, ask some questions, and then I'll

18    give you rebuttal time.

19              MR. DUNNING:  Certainly, Your Honor.  Thank you.

20              May I approach the lectern?

21              THE COURT:  And you are Mr. Dunning?

22              MR. DUNNING:  Yes.

23              THE COURT:  Thank you.  Go ahead.

24              MR. DUNNING:  Yes, good morning.  As noted,

25    Your Honor, we are here on the motion for summary judgment

 1   filed by Caesars Entertainment.  Caesars Entertainment is the

 2   parent company of an entity named Desert Palace, Inc.  Desert

 3   Palace is the -- is an operating company which operates and

 4   manages the Caesars Palace Hotel and Casino in Las Vegas.

 5        Now, Desert Palace, during the relevant period,

 6   leased a retail space within Caesars Palace to an entity named

 7   Carnivale Gallery, which is the co-defendant in this case.  I

 8   should have said there are two co-defendants, Carnevale

 9   Gallery and Mr. Carnevale in his personal capacity, but I'll

10   just refer to Carnevale Gallery as the co-defendant.

11        So the plaintiff alleges that Carnevale Gallery

12   committed copyright infringement by displaying a single art

13   work in which the plaintiff, Mr. Moebius, owns a copyright

14   that the plaintiff contends was an unauthorized reproduction

15   and, therefore, the display of that artwork constituted a

16   copyright infringement.

17        So, Your Honor may be wondering, why is Caesars

18   Entertainment here?  And frankly, Your Honor, we've been

19   wondering the same thing for a year and a half now.  The

20   reason we're here, at least for the pleadings, is that the

21   plaintiff has alleged a threadbare claim that Caesars

22   Entertainment is vicariously liable for the alleged

23   infringement that was committed by Carnevale Gallery of the

24   plaintiff's copyright.

25        Now, the plaintiff relies primarily on a Ninth

1    Circuit case, *Fonovisa v. Cherry Auction* which is readily --

2    effectively readily distinguishable from the facts in this

3    case.

4        But before I talk about the, you know, that case in

5    detail, the Ninth Circuit in that case stated that the

6    Copyright Act does not provide for liability on the part of

7    anyone except the direct infringer.  The theory of vicarious

8    liability for a third party under copyright infringement

9    arises from the doctrine respondeat superior which holds that

10   an employer can be liable for infringing acts committed by an

11   employee.

12       So, over time, courts have extended that respondeat

13   superior doctrine to cover other cases.  But as the *Fonovisa*

14   court itself stated, that document, vicarious liability,

15   really is only appropriate in a case where the defendant's

16   economic interests are intertwined with those of the direct

17   infringer.  And that is, what we have in this case, is the

18   antitheses of that, Your Honor.  We have a typical arms'

19   length commercial lease between the landlord and a lessee.

20       Now, you know, plaintiff's theory, it basically

21   amounts to strict liability for commercial landlords for

22   copyright infringement committed by a commercial tenant on the

23   landlord's property, which courts have repeatedly stated is

24   not the holding of *Fonovisa* and it's not -- it's a gross

25   overreach of what the *Fonovisa* court actually held.

1          Now, the analysis that the *Fonovisa* court went

2    through, the Court cited to an earlier Second Circuit case,

3    the *Shapiro* case, that basically drew a distinction between

4    two lines of cases dealing with vicarious liability.  One they

5    referred to as the "landlord/tenant cases," and those were

6    cases where a landlord who lacked knowledge of the infringing

7    acts of the tenant and who exercised no control over the

8    tenant services was not liable for infringement by its tenant.

9          And then on the other extreme are what the *Shapiro*

10   court and the *Fonovisa* court referred to as the "dance hall

11   cases."  Those are cases where an operator of a dance hall and

12   entertainment venue hired a band to perform, charged people

13   admission to come see the performance, and hired the band even

14   knowing or with indifference to the fact that the band was

15   committing copyright infringement by performing music --

16   copyrighted works without authorization.  So in those cases,

17   the dance hall cases, the sole purpose for the business

18   enterprise operated by that defendant was to facilitate the

19   infringement, even if the defendant was not the one who

20   actually was the direct infringer.

21          And the *Fonovisa* case, which we should note -- first

22   of all, the *Fonovisa* case was a direct insufficiency of the

23   plaintiff's pleadings.  It was a case on a motion to dismiss,

24   so it was not dealing with -- the Court did not actually find

25   liability in that case, all it found was that the plaintiff

```
1   had adequately stated a claim for vicarious liability on the
2   part of the defendant, which in that case, Cherry Auction, was
3   an operator of a swap meet, or a flea market as they're also
4   known, where they rent -- the defendant rented booths in a
5   building or a facility to individual vendors and people came
6   to buy goods from the vendors.
7           Again, you know, the sole purpose of the economic
8   enterprise there was to provide cheap goods for people to come
9   and buy who don't want to go to a department store and pay
10  higher prices; right?  So the operator of the swap meet
11  clearly had a incentive to look the other way at the
12  infringement committed by the vendors.
13          THE COURT:  Can I just -- I just want to ask you,
14  Desert -- you maintain that Desert Palace is in privity of
15  Carnevale.  I mean, it's the landlord of the Gallery.
16          MR. DUNNING:  That's correct, Your Honor.  Yes.
17          THE COURT:  So I'm trying to just understand the
18  relationship, the level of relationship between these three
19  actors.  Because it seems that the plaintiff sued the Gallery
20  and it sued Caesars, but didn't sue the middleman, perhaps, or
21  the actual landlord, which is Desert Palace.
22          MR. DUNNING:  Right.
23          THE COURT:  But then there's some -- but I expect to
24  hear from plaintiff that plaintiff did not sue Caesars because
25  he thought Caesars was the landlord.  And if I'm not -- if I'm
```

1   understanding some of the facts -- so this came out, they

2   learned this from your motion for summary judgment, and

3   then -- so I need you to address Caesars relationship with

4   Desert Palace and the role of Robert Morris who, I guess, is

5   the signatory to a lease agreement, or what I guess you call

6   the license.  You call the license or the lease -- you call

7   the lease a license; right?

8          MR. DUNNING:  Yeah, it's referred to as a license

9   agreement, but, in essence, a lease.

10         THE COURT:  If you could address those.  Thank you.

11         MR. DUNNING:  Yes, Your Honor.  You are correct that

12  there are basically two levels of -- basically there would

13  have to be vicarious liability on two levels for the Court to

14  find Caesars Entertainment to be liable here.

15         The first level is that Desert Palace, the landlord

16  that had the lease agreement -- that leased space to

17  Carnevale, the Court would have to find that Desert Palace was

18  vicarious liable for the acts of Carnevale.  And then, as a

19  second inquiry, the Court would have to find that Caesars

20  Entertainment is vicariously liable as the parent company of

21  Desert Palace.  So our position, Your Honor, is that that

22  second level, the Court doesn't even need to address that in

23  order to rule on this motion.  Because if Desert Palace cannot

24  be vicariously liable for the acts of Carnivale, then, by

25  necessity, Caesars Entertainment, likewise, cannot be

1    vicariously liable as the parent of Desert Palace.

2         THE COURT:  Well, I'm not looking -- at the moment

3    I'm not looking at whether Desert Palace is liable because --

4    or can be liable because they're not in the lawsuit and

5    haven't filed a motion for summary judgment.  I'm trying to

6    understand the relationship between Caesars Palace and Desert

7    Palace -- Caesars Entertainment, pardon me, and Desert Palace.

8         MR. DUNNING:  So our position on that, Your Honor,

9    is that that relationship is not material to the issue of

10   whether vicarious liability applies here, because, you know --

11   and you're correct, Desert Palace is not in the case.  But I

12   would say Desert Palace is kind of in the position of while

13   not a necessary party, certainly, in order to address the

14   issue of liability here, it -- the Court has to look at both

15   of those levels; right?

16        And so, you know, the plaintiff tries to suggest

17   that there's a -- there are material factual disputes

18   regarding the relationship between Caesars Palace -- I'm

19   sorry, Caesars Entertainment and Desert Palace.  Our position

20   is that regardless of whether there are factual disputes on

21   that issue, they're not material here.  Because what the Court

22   really needs to look at is, is there -- and another way to

23   conceptualize this would say, let's find -- for purposes of

24   this motion, let's just say that Caesars Entertainment and

25   Desert Palace are one and the same.  You know, legally we're

1   not conceding that, but for purposes of this motion we'll

2   accept that.  Because our position is that Desert Palace, were

3   it a defendant, would not be vicariously liable for the acts

4   of Carnevale.  And were it a defendant, it would be joining in

5   this motion for summary judgment.  The plaintiff has chosen

6   not to name Desert Palace as a defendant.  That's for reasons

7   that only plaintiff would know.  I don't know what those are.

8   So I hope --

9           THE COURT:  Isn't there an aspect of the lease --

10   well, is it true that Carnevale is paying rent to Caesars

11   Entertainment?

12           MR. DUNNING:  During the relevant time, Carnivale

13   was paying rent like any other retail tenant would pay rent to

14   the landlord, that's correct.

15           THE COURT:  I'm just asking, do they make a check

16   payable to Caesars Entertainment?

17           MR. DUNNING:  I don't know as I stand here which --

18   who the check's made payable to.

19           THE COURT:  Okay.

20           MR. DUNNING:  But, again, our position would be

21   that's not a material fact to the issue before the --

22   currently before the Court.

23           THE COURT:  I guess, isn't there -- there was --

24   could Caesars eject -- let's just say hypothetically, could

25   Caesars eject Carnevale?

1          MR. DUNNING:  Well, so Desert Palace has the -- had

2     the contractual right as a -- as is typical in a commercial

3     lease to terminate the lease, that's correct.  And, again --

4          THE COURT:  And it can be terminated for any reason?

5          MR. DUNNING:  I believe they were permitted to

6     terminate for any reason, yes.

7          THE COURT:  And couldn't they terminate it for --

8     don't they have final say over the products that are sold at

9     Carnivale?  Can't they sort of basically have a say over

10    you're not selling good products, we don't approve of the

11    products?  Let's say, for example, it's an ice cream store,

12    and they start selling adult rated -- you know, things that

13    the mall doesn't want there.  They can say, I'm sorry, but

14    we're ejecting you because we don't -- well, we don't approve

15    these products and with five days' notice we're ejecting you.

16         MR. DUNNING:  Well, per the lease, there is language

17    in there that says Desert Palace has some -- has some ability

18    to monitor -- I don't remember the exact language -- monitor

19    or control what Carnivale sells.  However, you know -- and we

20    don't dispute what the lease says.  However, even accepting

21    that factually, the law on vicarious liability requires more

22    than that for a finding of the landlord to be vicariously

23    liable.

24         If you look at the *Fonovisa* case and the subsequent

25    *Adobe Systems* case from the Central District of California,

1    which really goes into more detail on why -- how the holding

2    of *Fonovisa* is not nearly as broad as plaintiff suggests, that

3    the standard as to what constitutes right and ability to

4    control for purposes of vicarious infringement is either, one,

5    there's a master/servant relationship; or, two, the defendant

6    is engaged in pervasive participation in the business

7    activities of the infringer.  And that requires something more

8    than simply a commercial landlord that rents space, collects

9    rent, and insures that its tenant operates its business in a

10   lawful manner.  That's not enough to rise to the level of

11   pervasive participation that the case law requires for a

12   finding of vicarious liability here.

13           In order for there to be pervasive participation,

14   there has to be actual participation in the business affairs

15   of the infringer.  For instance, in the dance hall cases,

16   the -- you have a situation where the operator of the venue

17   hired the band, and hired the band for the express purpose of

18   performing music which was not authorized.  And the swap meet

19   cases, like *Fonovisa*, you have, again, a situation where the

20   operator of the swap meet put all the vendors -- you know,

21   organized and brought in these vendors for the express purpose

22   of selling cheap goods, knockoff goods, without, you know,

23   any --

24           THE COURT:  No, I understand what you're talking

25   about.  The draw concept where the landlord is sort of in on

1   the attraction of whatever the infringement activity is.  In

2   that way maybe it's, to a degree, sort of in on the business

3   model.

4   MR. DUNNING:  Right.  And that goes to the direct

5   financial benefit prong of the vicarious liability

6   three-factor test.  And you're correct, Your Honor, that the

7   law is clear that the ability to purchase infringing products

8   has to be the primary draw for consumers to the venue.

9   For instance, if we look at the *Fonovisa* case, the

10  Ninth Circuit there said, well, there are clearly facts

11  alleged that show that this was the draw to the venue.  There

12  was -- it was undisputed that most of the vendors there were

13  selling unlicensed recordings.  There had been raids where

14  tens of thousands of products were seized.  There had been

15  letters sent by the sheriff to the defendant.  All of this,

16  you know, clearly showing that the reason people came to the

17  swap meet was because cheap, bootlegged tapes, basically.

18  THE COURT:  So can I just go back to my question.

19  Can you just -- can you just fill in the gap about who is --

20  is Robert Morris an employee of Caesars Entertainment?

21  MR. DUNNING:  That's my understanding, yes,

22  Your Honor.

23  THE COURT:  And did he sign the license agreement?

24  MR. DUNNING:  He did sign the license agreement.

25  Yes, that's correct.

```
 1            THE COURT:  And then you responded to the request
 2   for production asking to identify the relationship between
 3   Desert Palace and Caesars Entertainment.
 4            MR. DUNNING:  We have produced documentation
 5   responsive to the plaintiff's request, yes.
 6            But I would say, again, you know, Robert -- the role
 7   of Robert Morris is -- our position -- is not material to the
 8   issue before the Court because -- again, we don't dispute that
 9   Caesars Entertainment is the parent of Desert Palace and that,
10   certainly, Caesars Entertainment has in that role some control
11   over Desert Palace.  And for purposes of this motion, you
12   know, we're not -- you know, there's no need to address that
13   issue, in our opinion, Your Honor.
14            THE COURT:  Okay.  All right.
15            I think I'll hear from the plaintiff, then I'll come
16   back to you.  Thank you.
17            MR. DUNNING:  Thank you, Your Honor.
18            MR. RUSSELL:  Good morning, Your Honor.
19            THE COURT:  Go ahead, Mr. Russell.
20            MR. RUSSELL:  So it is my understanding that this is
21   a motion for summary judgment.  We're not here to prove up any
22   of the facts, as I understand it.
23            And regarding the motion for summary judgment, it's
24   my understanding the party is entitled to a motion for summary
25   judgment if the movant is able to show that there is no issue
```

1    as to any material fact and the movant is entitled to judgment

2    as a matter of law.

3          The moving party bears the burden of establishing

4    the absence of any genuine dispute of material fact with all

5    reasonable inferences drawn in the nonmovant's favor.

6          Here, it appears that defendant is attempting to

7    turn this standard on its head, as you just heard, by stating

8    that material factual disputes are not material here and that

9    Robert Morris's role and the extent of control that Caesars

10   exercised over Desert Palace and, by extension, its premises

11   and Carnivale Gallery is irrelevant.

12         It is our contention that in doing so Defendant

13   Caesars has failed to meet its burden because the evidence in

14   the record demonstrates that there are disputes of material

15   fact such as the extent to which Caesars exercised control

16   over Carnivale and benefited from the infringement.

17         THE COURT:  Continue.  So I'm listening, and I

18   just -- so it would be helpful if you detailed that a little

19   bit more.  So how do you think -- what level of control do you

20   think Caesars had?  And why is it relevant that Robert Morris

21   signed the agreement?  And then, also, if you could address,

22   what is Carnevale's claim making checks payable to Caesars

23   Entertainment?

24         MR. RUSSELL:  I can't address as to whether

25   Carnevale was making checks payable to Caesars, but that's

```
 1    what it -- that's what they demanded.
 2              THE COURT:  Mm-hmm.
 3              MR. RUSSELL:  They actually directly intervened.  So
 4    that states that there's some level of control.  And they
 5    directed how the payment should be done.  That's control.  So
 6    there you have right there a dispute of material facts.  We
 7    don't know the level of control.  And that's an issue that
 8    needs to be explored in discovery.
 9              THE COURT:  Okay.  So what you need to show is the
10    right -- so maybe just sort of walk me through the test.  To
11    establish vicarious liability of Caesars -- and I'm basing
12    this on the Erickson test from the Ninth Circuit from 2019.
13    You need to show the right and ability to supervise the
14    infringing conduct and a direct financial interest in the
15    infringing activity.  So that may be a level of detail more
16    than just paying rent, so I just wanted you to -- I wanted you
17    to address those issues.
18              MR. RUSSELL:  Right.  So, first of all, you just
19    have to have the right and ability.  You don't even have to
20    control.  And that's something that defendant contends.  They
21    contend that they didn't control anything.  It doesn't seem
22    that way based on the facts.  But the reality is you just have
23    to have the ability to have control.
24              THE COURT:  And where do you find that ability?
25              MR. RUSSELL:  In the contract.
```

```
 1              THE COURT:  Okay.  In what, specifically?
 2              MR. RUSSELL:  In the contract it states that they
 3    were able to terminate that contract.  And it's based on the
 4    question that you raised earlier, they were able to terminate
 5    that contract for any reason whatsoever.  And they also
 6    required Carnevale Gallery to abide by its rules and
 7    regulations.  And so we contend, as a result, that Caesars,
 8    through its subsidiary, and/or its subsidiary, had control
 9    over Carnevale Gallery.  Because they -- and it's a question
10    as to -- okay, and this is the issue with Robert Morris.  Now
11    to have some kind of -- to have a high-level ranking executive
12    sign on behalf of Caesars for the contract, then that kind of
13    deflates defendants' argument that there is no control or even
14    that Caesars is not a party.
15              THE COURT:  What have you learned about the
16    relationship between Desert Palace and Caesars?
17              MR. RUSSELL:  At this point we haven't had any
18    additional discovery.  You know, there hasn't -- we haven't
19    had a chance to have discovery, as you have read in the
20    pleadings.  And as a result, at this juncture, it's my
21    understanding that we did have -- we did get some initial
22    responses.  We're waiting on a document request, but we -- to
23    my knowledge, we have not received anything more than that.
24    And we haven't received a document request.  And so no
25    additional -- no discovery has taken place.
```

```
1              THE COURT:  So you don't understand at this moment

2    whether Desert Palace is actually separate from Caesars.

3              MR. RUSSELL:  Exactly.

4              THE COURT:  Okay.

5              MR. RUSSELL:  That's exactly right.

6              And so one of the things that I did want to go over

7    that was mentioned earlier is that in Shapiro, when it

8    evaluated those two lines of cases, landlord/tenant and dance

9    hall cases, it determined that the relationship between that

10   store owner in that case and the concessionaire was closer to

11   the dance hall model than to the landlord/tenant model.  It

12   imposed liability, even though the defendant was unaware of

13   the infringement, because the proprietor derives an obvious

14   and direct financial benefit from the infringement.

15             And Gershwin Publishing then went on to hold that

16   even in the absence of an employer/employee relationship one

17   may be vicariously liable if he has the right and ability to

18   supervise the infringing activity and also had a direct

19   financial interest in such activity.

20             So here, you can't say there's no financial benefit.

21   I mean, obviously, they -- Caesars and Carnevale Gallery, they

22   both engaged in heavily promoting this -- the plaintiff's

23   work.

24             THE COURT:  How did they do that?

25             MR. RUSSELL:  I don't know all the particulars, but
```

```
 1    I know that, based on our pleadings, that's what we know and
 2    allege, that they both engaged in the promotion.  And they
 3    would not have engaged in this heavy promotion if it was of no
 4    benefit to them.  And there indeed was a draw because it was
 5    Moebius's fans who visited the premises and who noticed that
 6    it was a fake, and who took a picture of it and notified the
 7    plaintiff about it.
 8            THE COURT:  So I guess one question I have is -- I
 9    don't know why Moebius terminated his relationship with
10    Caesars or how many works in the past he had sold there, but
11    it does seem to me that the model of Caesars is a little -- or
12    at least my sort of experience in going to a place like that
13    is a little different than a swap meet because the
14    entertainment value is walking -- is not buying art, it's
15    walking around and seeing art while you -- or seeing something
16    that's sort of eye-catching, possibly expensive.  It's not
17    necessarily buying it.
18            MR. RUSSELL:  I would agree.  I agree.  And I think
19    that the notoriety -- you can't -- you can't measure benefit
20    just in terms of monetary benefits.  There's other benefits.
21    There's a draw.  There's marketing.  There's the notoriety.
22    There's the publicity.  All of that goes into play to create a
23    draw.  And we don't know to what extent there was a draw.  I'm
24    going to be honest about that.  We don't know.  That's an
25    issue of material fact that needs to be drawn out in discovery
```

1   for us to determine that in a more concrete basis.

2          Now, defendant argues that there was no draw.  So, I

3   mean, we have these two extremes here.  On the one hand,

4   defendant is saying no control, no draw.  On the other hand,

5   we are saying, okay, it may not be 100 percent control, and it

6   may not be 100 percent of a draw.  It may have been a huge

7   draw.  It may have been a small draw.  We don't know.  So

8   there are issues of material fact that need to be determined

9   and that are material to this case.

10          THE COURT:  So just on another point.  The lease --

11   I mean, the licensing agreement between Carnevale and Desert

12   Palace changed over a time so that at the time this is alleged

13   to have happened there was a flat-rate rent instead of a

14   percentage rent.  Can you just address that sort of whether

15   you think the flat rate is relevant at all to the infringement

16   and the direct financial benefit of Desert Palace and Caesars

17   Entertainment.

18          MR. RUSSELL:  Right.  I don't think it's relevant.

19   Because it's not just -- you know, I don't believe that rent

20   alone, like if somebody was just paying rent and they didn't

21   know anything -- you know, the landlord didn't know anything

22   about the infringement, was not involved, was indeed an

23   absentee landlord, well, the cases don't hold them liable.

24   But, in this case, that's not the situation.  I mean, we see

25   that Caesars was indeed active because they engaged in the

1   collection efforts, they sent written communication, and also

2   they signed the agreement.  That's a huge thing right there.

3   But also --

4           THE COURT:  They're active -- but that seems to be

5   that they're active in collecting rent and interacting with

6   people who -- like businesses who are renting, but it doesn't

7   necessarily connect them at all to the infringing activity and

8   the direct involvement in the --

9           MR. RUSSELL:  Well, --

10          THE COURT:  -- I mean, the level of connection

11  that's required to get to vicarious liability is pretty high,

12  and it can't just be, it seems, kind of an incidental

13  financial benefit but needs to be sort of more, sort of

14  directly connected to the infringing conduct.

15          MR. RUSSELL:  Well, when we look at what *Fonovisa*

16  noted about *Gershwin*, they noted that *Gershwin* lacked a formal

17  contractual ability to control the direct infringer.

18  Nevertheless, because of the defendants' pervasive

19  participation there where there was no contractual agreement,

20  they held them liable.

21          THE COURT:  Right.  I'm not saying that I've seen it

22  in any facts here.  We do have, perhaps -- we may have a

23  contractual relationship, depending on the relationship

24  between Desert Palace and Caesars.  I -- you know, that has

25  not been established.  But it seems like that is a

```
1    possibility, I suppose.  But I have not heard a fact or a
2    piece of evidence that makes Caesars Palace directly involved
3    in that pervasive way that we're talking about to the
4    infringing conduct.  What's that connection?
5            MR. RUSSELL:  Yes, so that's why I'm seeking to kind
6    of distinguish that.  Because here, Gershwin, they required
7    that in view of a lack of a formal contractual ability to
8    control.  So then they found control through the pervasive
9    activity and participation.
10           THE COURT:  Right.  So what --
11           MR. RUSSELL:  But here we have a contractual
12   agreement.
13           THE COURT:  Oh, I see.  You're saying in lieu of
14   pervasive activity, we have a contractual agreement.
15           MR. RUSSELL:  Yes.  We have a contractual agreement
16   here that gives them control, and substantial control.
17           THE COURT:  Because they can -- if they were to get
18   a phone call saying I think that there's a fake on display in
19   your mall, they could say you're out.
20           MR. RUSSELL:  Yeah.
21           THE COURT:  Here's your five days' notice, good-bye.
22           MR. RUSSELL:  Yeah, and they would have to pack it
23   up.
24           THE COURT:  So there's no indication that they --
25   that they were in the know in that way.  As much as you know
```

```
 1    about this case, that they had been alerted and then kind of
 2    failed to act in which case they sort of participated in the
 3    infringement in that way.
 4              MR. RUSSELL:  Right.  So what I would say to that
 5    is, first of all, I don't think it's undisputed.  We don't
 6    know.
 7              THE COURT:  Okay.
 8              MR. RUSSELL:  We need to do discovery.  We don't
 9    know what happened.  And so we need to continue with
10    discovery.  But not only that, we -- we -- let's see here.  I
11    think I have something that kind of -- so because this is a
12    strict liability regime, whether Defendant Caesars was -- had
13    knowledge or had intent or their state of mind, any of that,
14    is just irrelevant.  And we're not required to show that or
15    prove that under that -- under copyright infringement as it is
16    strict liability.  And that's why you have that ability to
17    control.
18              THE COURT:  Can you tell me a little bit about -- so
19    I understand -- my understanding, correct me if I'm wrong, is
20    that the parties sort of informally agreed to not move forward
21    with discovery when the motion to -- I mean, earlier, and that
22    now discovery is ongoing as you close in January; is that
23    correct?
24              MR. RUSSELL:  Excuse me, one moment.
25              I'm still getting over a cold.  I'm so sorry.
```

1          It's my understanding that we did agree to a stay,

2     and so nothing was done.  And we didn't -- oh, and to answer

3     your question from earlier, when the motion for summary

4     judgment was filed, we didn't know anything about Robert

5     Morris or Desert Palace until the actual motion for summary

6     judgment, none of that information was disclosed prior to, so.

7     And, in addition, as far as the motion for summary judgment is

8     concerned --

9          THE COURT:  So let me stop you there.

10         Is it your position that it should have been

11    disclosed earlier in response to initial disclosure?

12         MR. RUSSELL:  I believe so, yes.  Because they knew

13    this action was pending.  You know, I would have expected them

14    to disclose that in their initial disclosures.  I mean, it

15    seems like -- I don't know why it wasn't disclosed.  I can't

16    speculate as to that.  But it seems like there was some

17    gamesmanship there.

18         THE COURT:  Okay.  So tell me more about discovery

19    in terms of where you are.

20         MR. RUSSELL:  In terms of discovery, nothing has

21    happened since the initial disclosures.  The -- because

22    immediately after this motion for summary judgment was filed,

23    and we haven't, like I said, nothing has progressed since

24    then.

25         THE COURT:  Did you get responses to your request

```
 1    for production?
 2            MR. RUSSELL:  I believe that we did get some initial
 3    responses, but I don't think that we've got the documents yet.
 4    Because last I checked we were still waiting on that.
 5            THE COURT:  Okay.
 6            MR. RUSSELL:  So -- and I haven't gotten any
 7    since -- I think this was since the beginning of this week, no
 8    update was provided to me as to that.
 9            THE COURT:  Okay.  And so -- and when will
10    discovery -- what is your estimation of the time of discovery?
11    How long that would take and what do you hope to find out
12    relative to the showing what you need to show?
13            MR. RUSSELL:  You have very hard questions,
14    Your Honor.  I appreciate that question.  I don't know as far
15    as the timeline.  I don't know what we might expect going
16    forward as to how long we need to engage in discovery.  But I
17    do know some of the things that we hope to come out of that,
18    and one of the things is the things -- well, a big part is
19    what we're discussing today, really, that level of control.
20    Was Caesars actually a party?  How -- what was their level of
21    involvement with Carnevale Gallery?  What level of control did
22    they actually exercise?  And also the financial benefit.
23    Because at this point we can't determine how much of a draw
24    there was.  We believe there was a draw based on the facts,
25    you know.  And like I mentioned to you, it was Moebius's fans
```

1    that had visited Caesars and saw Moebius's work and was the

2    one that alerted it -- alerted that to Moebius.

3              And also, you know, just his status as an

4    international artist.  I mean, he's world renown.  So there

5    definitely was some draw.  And the promotion that they engaged

6    in, you know, to promote his work.  And I don't think that

7    they would have done a copy of it if there was no draw, there

8    was no impetus.  I mean, there's a considerable amount of

9    resources to engage in that.

10             So we want to get -- you know, we want to engage in

11   discovery so we can get to the bottom of that.

12             THE COURT:  Okay.  Thank you.

13             MR. RUSSELL:  Thank you, Your Honor.

14             THE COURT:  So Mr. Dunning, you can come up briefly,

15   but then I will --

16             MR. DUNNING:  Thank you.  May I approach,

17   Your Honor?

18             Okay.  I'll just try to quickly address several of

19   Mr. Russell's points.  Plaintiff's counsel on multiple

20   occasions misstates or ignores the applicable law to the

21   question before the Court.  First of all, plaintiff's counsel

22   just stood up here and said this is a strict liability regime.

23   And that's incorrect.  If you're looking at a liability of a

24   direct infringer, that is correct.  That is patently incorrect

25   with regard to the issue of vicarious liability.

1      *Fonovisa* doesn't say that.  There's not a single

2  case that says that.

3          And if you look at the *Adobe Systems* case which

4  applied and distinguished *Fonovisa*, according to that case,

5  said, virtually all commercial landlords or trade show

6  operators derive a direct financial benefit from the rest of

7  the tenants or from the booth fees of vendors, as well as from

8  the revenues associated with the services provided to

9  consumers at the venue, such as parking and concessions.

10  Strict liability for this entire class of commercial landlords

11  cannot be the lesson of *Fonovisa*.

12          But that's the argument the plaintiff is making and

13  that is completely contrary to the law.

14          Also, plaintiff contends that a contractual right of

15  a landlord to exert some control over its tenant in the form

16  of a right to terminate is sufficient to qualify a landlord

17  for vicarious liability.  Again, that's incorrect.  As this

18  Court notes, there has to be some form of pervasive

19  participation.  And, again, there's not a single case that

20  stands for that proposition that simply having a right -- a

21  landlord having a right to terminate a tenant is sufficient

22  right and ability to control to subject the landlord to

23  vicarious liability.  There's not a single case that says

24  that, Your Honor.

25          And then with regard to whether there was a draw for

consumers to visit the venue to purchase infringing goods,

again, you know, plaintiff is misstating the law there.  It --

there may be a draw for consumers who want to purchase

legitimate Michael Moebius art works.  That's the reason why

Carnevale would have the -- would agree to sell them in the

first place, because he thinks consumers want to buy them.

That's not the standard, Your Honor.  The standard is whether

there is a draw for consumers to visit a venue to purchase

infringing products.  The presence of the infringing goods has

to be what draws consumers to the venue.  And there's no

evidence in the record of that.  And the Court understands

that people are not -- consumers are not going in to Caesars

Palace because they think they're going to get cheap

counterfeit art works or Gucci bags or whatever.  There's no

evidence of that.

         Plaintiff suggests that he needs discovery on this

issue.  You know, it's plaintiff's burden to point to some

evidence to -- that would establish it to be an issue.  In

fact, if plaintiff believes they need discovery for that,

well, Rule 56(d) lays out procedures the plaintiff must

follow.  And plaintiff has to establish by affidavit what

facts they seek and how those facts would be material to the

issue before the Court.  They've done -- the plaintiff has

done none of that because those facts don't exist, Your Honor.

There are no facts that would show that Caesars Palace -- or,

1    excuse me, that the activities of Caesars Entertainment or

2    Desert Palace would give rise -- that there's any facts that

3    would give rise to a draw to consumers to come to Caesars

4    Palace to purchase infringing art.  It doesn't exist.  That's

5    why we haven't seen any requests from -- or any -- any proper

6    Rule 56(d) request from the plaintiff for discovery.

7          And finally, Your Honor, with regard to Robert

8    Morris and the relationship between Caesars Entertainment and

9    Desert Palace, this is -- we know as a straw man, Your Honor.

10   As I mentioned earlier, our position is, even if the Court

11   assumes that Caesars Entertainment and Desert Palace are the

12   same entity, we still -- summary judgment is still appropriate

13   to Caesars Entertainment or Desert Palace.  It seems like

14   plaintiff made a strategic decision not to name Desert Palace

15   as the defendant so they could set up this straw man argument,

16   Your Honor.  That's all it is.  What role Robert Morris plays

17   here, I can't tell you what that is, but it's not material to

18   the issue before the Court as to whether the Desert Palace or

19   Caesars Entertainment, assuming -- again, we'll assume they're

20   one and the same for purposes of this motion -- satisfies

21   their requirements for vicarious liability under the law for

22   the alleged infringement committed by Mr. Carnevale.

23         And last point, the allegation here is that the

24   infringement was one art work displayed in the gallery on one

25   occasion.  Contrast that with the allegations in *Fonovisa*, you

1    know, thousands upon thousands of counterfeit goods sold by

2    many, many vendors at the swap meet.  Contrast that with even

3    *Adobe Systems* where the Court found a swap meet operator

4    was -- or a computer fair operator was not vicariously liable.

5    Even though there were multiple vendors that sold infringing

6    products, there was no dispute as to that.  And the Court said

7    in that case, I believe it was less than two percent of the

8    vendors were found to sell infringing product, and that was

9    less than 1 percent of the sales.  That was not enough, even

10    with demonstrated admitted infringement, to rise to the level

11    of pervasive participation that's required here.

12          So with that, Your Honor, thank you for your time.

13    And unless you have any other questions, I will wrap up.

14          THE COURT:  Thank you.

15          MR. DUNNING:  Thank you.

16          THE COURT:  So here's what I -- where I am.  I do

17    recognize that the standard for vicarious liability is very,

18    very high.  I'm basing that on *Fonovisa* and *Adobe*, and then

19    the Ninth Circuit decision in *Erickson*.  All of those cases

20    come up in a slightly different posture in terms of motion to

21    dismiss.  And *Erickson*, I believe, was after a trial.  I'm

22    just looking at the legal standard in that particular context.

23    But the standard is really high, and I'm not sure, based on

24    what I've seen, that I've seen anything that shows that the

25    plaintiff is on route to meeting that standard.

1          I say that, but at the same time I am -- summary

2    judgment is final once it's done, and there are sort of a few

3    procedural sort of shortcomings here.  Plaintiff notice, one,

4    which is the failure to sort of state which facts are not

5    contested.  Defendant has noted -- the movant has noted that

6    plaintiff has not really set forth in an affidavit the facts

7    that plaintiff will discover in order to genuinely contest and

8    show that the issues of fact are disputed.

9          So I guess from what I've seen, I think that this is

10   going to be maybe an impossible hill to climb for the

11   plaintiff.  But I also feel that the motion is premature at

12   this moment.

13         So, unfortunately, that -- of course, it's

14   defendants' right to move promptly for summary judgment based

15   on defendants' sort of well-founded theory that there is not

16   enough here to show that Caesars Entertainment can be found

17   vicariously liable.  But given that the parties stopped

18   discovery and had not genuinely started it and discovery is

19   still open, and summary judgment is final once it's entered,

20   it's a real judgment, I do believe that it's premature at this

21   moment.  So I think I'm -- would -- I'm going to deny the

22   motion for summary judgment today without prejudice because it

23   can be renewed at the conclusion of discovery.

24         So once discovery is closed, I anticipate seeing

25   that motion again.  But I do feel that there are some genuine

1    issues of fact that I don't want to minimize, and one of those

2    is there -- I appreciate that Caesars Entertainment is saying

3    whatever the relationship between Desert Palace and Caesars

4    Entertainment, we are nowhere near the level of pervasive

5    engagement.  Direct contact in the infringing activity that

6    we've seen, that's the level that's been required in the case

7    law.  I tend to agree with that.  But I think it's perhaps too

8    dangerous to just assume that that relationship doesn't matter

9    or that they are one and the same because it's unclear to me

10   what the facts surrounding that relationship are.  And I don't

11   want to presume anything without sort of certainly knowing a

12   little bit more about -- or having plaintiff be able to point

13   to evidence that might be helpful in terms of understanding

14   the contract and the direct control over -- the direct

15   financial interest and the direct control to the infringing

16   conduct if there is -- if that relationship can be

17   established.

18         So I do believe it's premature to grant summary

19   judgment.  But I do want to tell plaintiff, this is a really

20   hard claim to prove up based on the case law, which sets a

21   very high -- I mean, it seems what I've heard from Caesars is

22   correct and that there is a high showing that's required for

23   that vicarious liability.  And it's really that connection,

24   financial interest and control and the draw.  It's not just

25   sort of on a general business model, but connected to the

1    infringing conduct which is to my mind what is -- I'm not

2    really being factually here, but maybe that can be -- maybe

3    there is going to be able to come to light in discovery that

4    will illuminate it.

5            So with that, I'm going to deny the motion for

6    summary judgment without prejudice.  It can be renewed once

7    the discovery is closed.  And then I will just advise both of

8    you if we are back again with that motion to be by the book in

9    terms of both detailing undisputed issues of fact so that

10   they're clear.  That makes it much easier for the Court and

11   the other side to contest and really, you know, identify what

12   is contested.  And then, also, plaintiff, that once discovery

13   is closed, the facts are the facts based on whatever you've

14   been able to discover, and we'll go from there.

15           Thank you for your time.

16           MR. RUSSELL:  Thank you, Your Honor.

17           MR. DUNNING:  Thank you, Your Honor.

18       (Proceedings concluded at 11:06 a.m.)

19

20

21

22

23

24

25

1        **REPORTER'S CERTIFICATE**

2

3            I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 32 pages,

5    constitutes a true and accurate transcript of my stenographic

6    notes and is a full, true, and complete transcript of the

7    proceedings to the best of my ability.

8            Dated this 10th day of January, 2023.

9

10           DONNA J. PRATHER, RMR, CRR, CCP, CBC
             Federal Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25